## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK
### White Plains Division

| | |
|---|---|
| RICHARD O'CONNELL,<br><br>                      Plaintiff,<br><br>v.<br><br>TOWN OF BEDFORD POLICE DEPARTMENT; AND MELVIN PADILLA AND MICHAEL CALLAHAN, INDIVIDUALLY,<br><br>                      Defendants. | No. 20-cv-170<br><br>COMPLAINT FOR VIOLATIONS OF THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT<br><br>DEMAND FOR DAMAGES, AND JURY TRIAL<br><br>EXEMPT FROM FILING FEES UNDER 38 U.S.C. § 4323(h)(1) |

## COMPLAINT

Plaintiff, Richard O'Connell ("Plaintiff" or "Sergeant O'Connell"), by and through his undersigned attorneys, brings this Complaint against the Town of Bedford Police Department, Melvin Padilla, and Michael Callahan (collectively, hereafter "Defendants"), and alleges as follows:

### I. NATURE OF THIS ACTION

1.     This is a civil action brought pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301 - 4335 ("USERRA"). Defendants willfully violated Sergeant O'Connell's USERRA rights: first, by denying him his benefits of employment based on his military service obligation, and, second by retaliating against him because he exercised his USERRA

rights.  Sergeant O'Connell seeks his lost wages and benefits, an injunction, as well as liquidated damages for Defendants' willful USERRA violations.

## II.   JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 38 U.S.C. § 4323(b).

3.     The United States District Court for the Southern District of New York is a proper venue for this action under 38 U.S.C. § 4323(c)(2), because Defendants are a municipal entity that maintain a place of business in this judicial district. Additionally, venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in this district.

4.     This action arose in Westchester County, New York, at the Town of Bedford; therefore, pursuant to local rules this action should be assigned to the White Plains Division.

5.     All statutory conditions precedent to the initiation of this lawsuit have been fulfilled.

## III.   PARTIES

6.     Defendant, Town of Bedford Police Department ("TBPD"), is a municipal agency that maintains a place of business at 307 Bedford Road, Bedford Hills, New York, 10507.

7.    TBPD employed, managed and controlled Sergeant O'Connell's employment opportunities at all times relevant to this lawsuit.

8.    For the purposes of 38 U.S.C. §§ 4303(4), 4323 of USERRA, TBPD is a private employer.

9.    Defendant, Melvin Padilla is a Police Chief for the Town of Bedford.

10.    Defendant, Melvin Padilla is Sergeant O'Connell's ultimate supervisor.

11.    Defendant, Melvin Padilla is a TBPD employee who controlled Sergeant O'Connell's employment opportunities at all times relevant to this lawsuit.

12.    For the purposes of 38 U.S.C. §§ 4303(4), 4323 of USERRA, Defendant, Melvin Padilla is a private employer.

13.    Defendant, Michael Callahan is a Police Lieutenant for the Town of Bedford.

14.    Defendant, Michael Callahan is Sergeant O'Connell's supervisor.

15.    Defendant, Michael Callahan is a TBPD employee who controlled Sergeant O'Connell's employment opportunities at all times relevant to this lawsuit.

16.    For the purposes of 38 U.S.C. §§ 4303(4), 4323 of USERRA, Defendant, Michael Callahan is a private employer.

17.    Sergeant O'Connell maintains a residence in Westchester County, New York.

18.     Sergeant O'Connell is employed with TBPD as a police sergeant.

19.     Sergeant O'Connell's military service periods while employed with TBPD do not exceed five years.

20.     Sergeant O'Connell's records for active duty reflect honorable service to the United States of America.

## IV.   FACTS

### History of Anti-military Animus at TBPD.

21.     In June 2011, Mr. O'Connell served as a police officer with the Larchmont Police Department.

22.     At approximately the same time Mr. O'Connell applied for a police officer position at the nearby Town of Bedford Police Department (hereinafter "TBPD").

23.     Mr. O'Connell interviewed for the TBPD position on July 1, 2011.

24.     During the July 1, 2011 interview, Sergeant O'Connell mentioned a pending possible deployment with his Army National Guard unit.

25.     On October 6, 2011, Mr. O'Connell received an email from Detective Joseph Comunale.

26.     Detective Joseph Comunale was the background investigator for Mr. O'Connell's employment application.

27.     Detective Joseph Comunale's email stated that Mr. O'Connell's background check was complete and "in the chief's hand."

28.     However, in mid-November, 2011, Larchmont PD Sergeant (Glenn Carney) notified Mr. O'Connell that the reason the TBPD did not hire O'Connell was because the TBPD "...won't hire someone who is about to deploy."

29.     Sgt. Carney then suggested that Mr. O'Connell contact the TBPD directly to advise them that his deployment was voluntary.

30.     The next day O'Connell called TBPD Police Chief Hayes and advised him that he, O'Connell, was awaiting TBPD's hiring decision before making a decision to volunteer for a deployment.

31.     Chief Hayes stated that he was under the impression that O'Connell was definitively deploying.

32.     Chief Hayes then stated that he would check on the background investigation status.

33.     Mr. O'Connell was immediately processed for hiring within days of this call.

34.     On November 30, 2011, TBPD initiated a request to transfer Mr. O'Connell from Larchmont Police Department to TBPD.

35.     On December 23, 2011, Westchester County Human Resources approved the transfer request.

36.     On February 1, 2012, Mr. O'Connell began working for TBPD.

37.     In the Fall of 2012, Mr. O'Connell met an Air National Guard recruiter regarding the process of reenlisting/transferring services prior to his current military contract expiration.

38.     Shortly thereafter, Mr. O'Connell was on duty at TBPD and speaking with a coworker, Jon Evans, about O'Connell's intention to reenlist.

39.     Sgt. Melvin Padilla overheard the conversation.

40.     Sgt. Melvin Padilla interjected: "if you're still in the military at the time promotions come around, it's not going to look good for you".

41.     Fearing the repercussions Sgt. Padilla signaled, Mr. O'Connell halted his efforts to reenlist.

42.     In November of 2013, Mr. O'Connell was working with a Detective Sergeant, Thomas Diebold.

43.     Detective Sergeant Diebold was Det. Joseph Comunale's supervisor during O'Connell's background and hiring investigation.

44.     Detective Sergeant Diebold was responsible for reviewing all background investigations with the Chief of Police upon completion.

45.     Mr. O'Connell was aware that Detective Sergeant Diebold was responsible for reviewing all background investigations with the Chief of Police upon completion.

46.   O'Connell asked Sergeant Diebold if his military service had been a roadblock in the decision to hire him.

47.   Laughing, Sergeant Diebold stated: "I have to plead the fifth on that one; it was definitely a hot topic."

48.   On September 2, 2015, O'Connell (hereinafter Sergeant O'Connell) was promoted to the police rank of Sergeant.

49.   On or around March 2018, Sergeant O'Connell was approved by the Coast Guard for enlistment into the Coast Guard Reserve.

50.   In May 2018, now "Chief" Padilla received a background questionnaire from the FBI regarding Sergeant O'Connell's military security clearance.

51.   Chief Padilla then asked O'Connell: "What's this investigation for?"

52.   Sergeant O'Connell explained that he was in the process of reenlisting for approximately 2 years, the questionnaire was sent to multiple persons, and it is one of the last steps to reenlisting.

53.   Chief Padilla verbally reprimanded Sergeant O'Connell for "not advising him of this sooner."

54.   In fear of Chief Padilla again attempting to sabotage his reenlistment efforts, Sergeant O'Connell advised his military recruiter that there is a possibility

that Chief Padilla may hinder the background investigation in an attempt to stop Sergeant O'Connell from reenlisting.

55.    At this same time, Lt. Andrew Bellantone received an identical questionnaire because he had been listed as a previous supervisor for Sergeant O'Connell.

56.    Lt. Bellantone informed Sergeant O'Connell that he had been questioned by Padilla as to why he received a questionnaire as well.

57.    Lt. Bellantone advised Sergeant O'Connell that he was uncomfortable completing the form out of fear of reprimand from Chief Padilla.

58.    On approximately June 19, 2018, Lt. Bellantone, a former Coast Guard member himself, and who, on July 19, 2016, had written a positive letter of recommendation for Sergeant O'Connell's initial attempt to enlist in the Coast Guard, advised Sergeant O'Connell that he is uncomfortable using his previous letter of recommendation identifying himself as a Bedford Police Department member, out of fear of reprimand by Chief Padilla.

59.    In June 2018, Sergeant O'Connell received orders for Coast Guard training, and immediately emailed notice to his supervisor, Lt. Callahan.

60.     In July 2018, Sergeant O'Connell took leave to attend initial training with the Coast Guard.

61.     On or about August 10, 2018, Sergeant O'Connell returned to work at TBPD.

62.     On or about August 10, 2018, Lt. Callahan directed Sergeant O'Connell to direct all military leave requests to his attention.

63.     On or about September 17, 2018, Lt. Vincent Gruppuso also emailed Sergeant O'Connell, instructing Sergeant O'Connell to also include him in all notifications of military duty.

### a. Denial of the Benefit of Employment; the Opportunity to Select Work Hours or Location of Employment.

64.     TBPD police officers enjoy a collectively bargained benefit that allows the officers the opportunity to select work hours or location of employment by allowing an officer to "swap" shifts with another member of equal rank.

65.     Shift swap requests can be made as far as 60 days in advance of the date(s) requested.

66.     Shift swap requests are always approved upon receipt.

67.     Shift swap requests are even approved up to the date requested.

68.     If an officer swaps shifts, that officer receives regular pay, even if the officer works overtime because of the swap.

69.     Not paying overtime works to the advantage of the TBPD.

70.     In October of 2018, Sergeant O'Connell submitted shift swap requests with two other Sergeants.

71.     The shift swap requests were not approved upon receipt.

72.     On or about November 4, 2018, Sergeant O'Connell provided Lt. Callahan with verbal notice of his upcoming monthly military drill dates.

73.     Lt. Callahan directed Sergeant O'Connell to provide documentation to prove his drill obligation.

74.     Sergeant O'Connell explained to Callahan that no such documentation exists for short term military duty.

75.     On or about November 14, 2018, the above-mentioned shift swaps were still not approved.

76.     A fellow sergeant informed Sergeant O'Connell that Lt. Callahan told him that he is withholding approval for Sergeant O'Connell's shift swap requests because Sergeant O'Connell is in the military, and Lt. Callahan wants to ensure that he will be there for the dates in question.

77.     Sergeant O'Connell immediately inquired with Lt. Callahan about the decision to withhold approval for the shift swap requests.

78.      Sergeant O'Connell advised Lt. Callahan that treating him with any form of bias based on military obligations is against the law.

79.     Nevertheless, Chief Padilla later ratified this decision to withhold approval for the shift swap requests.

80.     In fact, a month later, on December 19, 2018, Chief Padilla told Sergeant O'Connell that Lt. Callahan decided to withhold the shift change requests until 7 days prior to the requested change, to ensure that Sergeant O'Connell was not on military leave for that date.

81.     Citing USERRA, Sergeant O'Connell advised Chief Padilla it is discriminatory to withhold a benefit of employment based on military service obligation.

82.     Chief Padilla responded: "Well you are the only one in the military."

83.     Sergeant O'Connell also explained to Chief Padilla that withholding shift changes until the week prior, puts Sergeant O'Connell at a significant disadvantage with his peers because they will no longer want to swap shifts with him if doing so requires his peers to not receive approval until a week prior.

84.     The meeting between Chief Padilla and Sergeant O'Connell continued for nearly three hours.

85.     As directed, from January to August 2019, Sergeant O'Connell continued to notify Lt. Callahan of his upcoming military leave dates via email.

**b.  Demanding Documentation in Contravention of USERRA.**

86.    On October 23, 2019, Lt. Callahan emailed Sergeant O'Connell and demanded documentation for all military duty dating back to January 2019.

87.    Sergeant O'Connell responded by email and explained, again, that he does not receive formal documentation of regular drills, because that documentation is primarily only issued for schools or extended training.

88.    On December 31, 2019, Sergeant O'Connell sent Lt. Callahan an email providing notice of his January military duty dates.

89.    On January 14, 2020, Lt. Callahan emailed Sergeant O'Connell, stating in pertinent part: "As stated earlier – We need some type of documentation that you attended. You receiving a text and us getting an email is not sufficient."

90.    On January 17, 2020, Sergeant O'Connell returned to work and read the above email message from Lt. Callahan.

91.    Sergeant O'Connell immediately went to speak with Chief Padilla.

92.    Sergeant O'Connell explained to the chief that he has already explained to Lt. Callahan that there is no such thing as formal orders for short term military duty.

93.    Citing 38 U.S.C. § 4312(f)(1) and 20 C.F.R. § 1002.121, Sergeant O'Connell further explained that a servicemember is not required to provide documentation to an employer for periods of service under 30 days.

94.     Also citing USERRA (38 U.S.C. 4312(a)(1), 20 C.F.R. § 1002.85(c)), Sergeant O'Connell further explained that not only was an email notification sufficient, but a verbal notice alone is sufficient as well.

95.     Chief Padilla dismissed Sergeant O'Connell's legal citations and said there is no such law.

96.     The meeting lasted nearly two hours, while Sergeant O'Connell defended his USERRA rights and cited the law of USERRA.

**c.   TBPD Discriminated and Retaliated Against Sergeant O'Connell because he Exercised his Rights Under USERRA.**

97.     On January 19, 2020, Sergeant O'Connell filed a DOL/VETS USERRA complaint.

98.     On January 20, 2020, Sergeant O'Connell notified Chief Padilla and Lt. Callahan of his USERRA complaint with the DOL

99.     Sergeant O'Connell provided Chief Padilla and Lt. Callahan with the specific sections of USERRA that applied to their actions.

100.    From that point forward, Sergeant O'Connell was made the target of additional scrutiny by his supervisors.

101.    On January 20, 2020, Sergeant O'Connell notified Chief Padilla and Lt. Callahan that the demands for military documentation violated USERRA.

102.   On January 22, 2020, Lt. Gruppuso called Sergeant O'Connell into his office and stated in pertinent part: "I know exactly what's going on with you and I'm not involved."

103.   Lt. Gruppuso then proceeded to verbally reprimand Sergeant O'Connell for an insignificant call in December 2019.

104.   Lt. Gruppuso also denied Sergeant O'Connell's request to teach at Rockland County Police Academy, which he had done several times before without issue.

105.   Then, Lt. Gruppuso handed Sergeant O'Connell a personnel evaluation for 2019.

106.   The evaluation was full of negative comments, including a discussion of a contractual language dispute and an alleged "policy violation" for a policy that was not in existence at the time of the alleged incident.

107.   Sergeant O'Connell refused to sign the untruthful evaluation.

108.   On or about January 22, 2020, Sergeant O'Connell filed a grievance against Chief Padilla regarding the TBPD's Military Leave General Order that, in contradiction of USERRA, requires documentation from the servicemember for periods of service that do not exceed 30 days.  In contravention of USERRA, the policy states:

Military Leave

1. A member requesting Military Leave shall submit the receipt of military orders to report to the appropriate Division Commander. Military Leave shall be granted in compliance with section 242.5 of the New Your State Military Law. The Administrative Division Commander shall complete the appropriate entry in the department Electronic time and attendant system.

109. Chief Padilla ignored the grievance entirely.

110. On or about February 3, 2020, in accordance with the grievance procedures outlined in the Town of Bedford and Police Benevolent Association Collective Bargaining Agreement (CBA), Sergeant O'Connell delivered the grievance to the office of Town Supervisor Chris Burdick.

111. The grievance was then to be presented to the Town Board for review in accordance with the CBA.

112. On or about February 14, 2020, Sergeant O'Connell called Burdick and inquired whether any additional information was required to process the grievance.

113. Burdick responded that he did not require any further information.

114. To this date, Sergeant O'Connell has not received any response regarding this grievance, and the policy has not been changed.

115. At about the same time, in direct violation of the Town of Bedford's workplace violence policy, the members of the department administrative staff

began ignoring Sergeant O'Connell's routine requests and calls for and work-related assistance.

116.   From June 10 to July 2, 2020, Sergeant O'Connell attended training with the Coast Guard.

117.   On July 8, 2020, Chief Padilla called Sergeant O'Connell into his office.

118.   Chief Padilla issued Sergeant O'Connell a written reprimand for not entering a call for service on April 24, 2020.

119.   Sergeant O'Connell informed Lt. Gruppuso about the call for service at the time it occurred.

120.   Lt. Gruppuso specifically instructed Sergeant O'Connell that there is nothing to do with the call.

121.   Sergeant O'Connell explained to Chief Padilla that no call was generated specifically because of Gruppuso's comment that "there was nothing to it."

122.   Chief Padilla ignored the facts and issued Sergeant O'Connell the first formal reprimand and punishment in O'Connell's 12-year career.

123.   Chief Padilla imposed the harshest punishment he has ever dealt to a Bedford police officer.

124.   Chief Padilla prevented Sergeant O'Connell from taking any overtime for 30 days.

125.   This rarely imposed punishment has previously been applied to only very serious offenses, including showing up to work drunk, showing up to work drunk and driving a patrol car, refusing to attend a call for a dying toddler, and lying about being on-scene.

126.   On August 19, 2020, Sergeant O'Connell received a notice of active duty orders from the Coast Guard.

127.   The orders directed Sergeant O'Connell to begin military service on September 1, 2020.

128.   Sergeant O'Connell immediately sent an email notifying Lt. Callahan of the military orders.

129.   Lt. Callahan responded: "received."

130.   On August 22, 2020, Sergeant O'Connell returned from an out of state trip from a state with mandatory 14-day quarantine.

131.   Sergeant O'Connell was placed into a self-quarantine related to Covid-19 precautions.

132.   On September 1, 2020, Sergeant O'Connell started active duty with the Coast Guard.

133.   On September 2, 2020, Sergeant O'Connell received a telephone call from the Bedford Police Union attorney, John D'Alessandro, advising him that the Town of Bedford's attorney, Jaclyn Goldberg had contacted him and stated "they received Sergeant O'Connell's military orders and will be following the law".

134.   D'Alessandro further explained to Sergeant O'Connell that he would not receive pay, would lose his health and dental insurance, and the town would probably not provide him a holiday check in accordance with the CBA.

135.   As a sergeant with the TBPD, Sergeant O'Connell held many administrative duties and responsibilities, including being the lead administrator for several police operational systems.

136.   Accordingly, on September 3, 2020, Sergeant O'Connell directed his attorney to deliver a listing of administrative "turn-over" instructions to the Department so that the department had easy access to the systems Sergeant O'Connell administered.

137.   In response, the TBPD's attorney, Jaclyn Goldberg stated:

> The Town and I are aware that Sgt. Rich O'Connell submitted active duty military orders covering the period of September 1, 2020 through and including February 27, 2021.  Your below email seems to suggest that the Police Department attempted to communicate and/or impose work related obligations on Sgt. O'Connell since his departure on September 1st.  It is my understanding that such is not the case and that the Police Department **has no intention to attempt to communicate and/or impose work related obligations on Sgt. O'Connell while he is**

> **away on active duty**.  Since my client has no intention of
> contacting Sgt. O'Connell during his military duty, it will
> not be necessary for me to contact you in the future for any
> reason.  If things change, I'll be sure to let you know.

138.   On September 9, 2020, Sergeant O'Connell submitted paid leave requests through the TBPD's attorney.

139.   Because Chief Padilla was now aware that Sergeant O'Connell is represented by an attorney, Chief Padilla began a new campaign of discrimination and retaliation.

140.   <u>First</u>, on September 14, 2020, Sergeant O'Connell was informed by a coworker that Chief Padilla and Lt. Callahan would not be enforcing previously approved swaps Sergeant O'Connell had made with other Sergeants.

141.   These Sergeants were working for Sergeant O'Connell without the accompanying monetary compensation for Sergeant O'Connell.

142.   Consequently, Sergeant O'Connell worked over $1,000 of overtime for free.

143.   <u>Second</u>, rather than honor Sergeant O'Connell's paid leave requests, on September 14, 2020, in direct contravention of 38 U.S.C. § 4316(d), the TBPD denied Sergeant O'Connell's requests.

144.   Further, despite Ms. Goldberg's assurances not to require work related responsibilities or to communicate with Sergeant O'Connell (*supra*), Ms. Goldberg also responded to Sergeant O'Connell's paid leave requests, stating:

> While I understand that you previously informed me that you represent Rich O'Connell ("Sgt. O'Connell") with regard to his USERRA rights, Sgt. O'Connell has not notified the Chief of Police, or any Command Officer, that you are authorized to speak on his behalf (when appropriate).

145.   On September 14, 2020, Sergeant O'Connell notified Chief Padilla (and cc'd the TBPD attorney and his own attorney) stating that he is very busy while engaged in his military duties, that his attorney is authorized to speak on his behalf with regard to any matter of employment, to wit:

> Chief,
>
> I am very busy while on military duty. Accordingly, I directed my attorney to provide notice to the department through its attorney of the dates that I intend to use paid leave while I'm in military service. Those requests were apparently denied, and the town's attorney now tells us that I must communicate directly to you that I have designated Mr. Jarrard to speak on my behalf.
>
> Therefore, I designate, my attorney, Thomas G. Jarrard, JD/MBA to communicate with the town, police department or your attorneys on my behalf regarding: my requests for paid leave while on military duty, other benefits of employment, any other employment or military related matter, for the purposes of giving notices to the department, and regarding my availability to return to work.
>
> Mr. Jarrard has already provided your attorney the dates of my leave requests.

> If you have any questions or concerns while I am on
> military duty, have your attorney contact Thomas Jarrard,
> cc'd here.

146.   Third, on September 15, 2020, Ms. Goldberg responded in a 4-page

single spaced letter stating that while Sergeant O'Connell is on active duty, he must

submit his requests directly to the Chief or other commander via telephone, email or

U.S. mail.

147.   On September 15, 2020, as requested in Ms. Goldberg's letter, Sergeant

O'Connell emailed Chief Padilla directly regarding his paid leave requests.

148.   Fourth, rather than honor Sergeant O'Connell's paid leave requests, and

despite the assurances and instructions from the TBPD attorney, Chief Padilla,

responded, stating that, rather than the direct email request that O'Connell provided

(supra), Sergeant O'Connell must now access the department's personnel systems

to request paid leave.

149.   Sergeant O'Connell's paid leave requests were still denied.

150.   As a consequence of the denial of those paid leave requests, Sergeant

O'Connell and his family lost their dental coverage, because Sergeant O'Connell

had no paid hours during the month.

151.   In October 2019, Sergeant O'Connell took a Lieutenant Promotion test

with five other officers.   Sergeant O'Connell placed number one on the resulting

Lieutenant Promotion List, Sergeant O'Connell was number two on the previous Lieutenant Promotion List.

152.   On December 1, 2020, Sergeant O'Connell interviewed for promotion to both, Detective Sergeant and Lieutenant.

153.   On or about December 18, 2020, TBPD informed Sergeant O'Connell that he had been passed over for both promotions, in favor or less qualified applicants.

154.   As a result of Defendants' unlawful conduct in violation of USERRA, Sergeant O'Connell has suffered a loss of earnings and other benefits of employment in an amount to be proved at trial.

155.   As a result of Defendants actions, Sergeant O'Connell has had to hire private counsel to enforce his USERRA rights with respect to his right to civilian employment while serving on active duty in the Coast Guard Reserve.

156.   Further, as a result of Defendants' unlawful conduct and the necessity of this action to seek a remedy, Sergeant O'Connell fears further retaliation against his employment rights by Defendants or its managers, directors or employees.

157.   As such, any employment relationship that Sergeant O'Connell may have enjoyed with Defendants prior to filing this action is irreparably damaged through no fault of Sergeant O'Connell.

158.   Upon information and belief, Defendants are a party to contracts with the United States and the State of New York which prohibit Defendants from discrimination against veterans and military service members as further evidence of its knowing and reckless disregard for the protections afforded a service member under USERRA.

159.   Upon information and belief, Defendants maintained workplace posters that set out employer responsibilities under USERRA as required by 38 U.S.C. § 4334.

160.   At all times relevant hereto, Defendants had a duty to conduct themselves in compliance with the law, including USERRA and ensure its managers and agents followed the Act.

161.   The above-referenced actions by Defendants, and their agents, breached those duties.

162.   Defendants' alleged reasons for denying Sergeant O'Connell's proper pay and benefits of employment are a pretext created to avoid the truth and legal liability.

163.   At all times relevant to this lawsuit, Defendants were aware of the law of USERRA.

164.   Defendants were given multiple notices of the law of USERRA prior to this lawsuit.

165.   Defendants are highly trained legal professionals, with experience and immediate access to the provisions of USERRA, with the support of a sophisticated Human Resources Department, including immediate access to professional human resources personnel, and specially trained employment counsel.

166.   To the extent that Defendants allege application of any agreement that constitutes any limitation on Plaintiff's rights under USERRA, it is illegal, null and void, inapplicable and of no force or effect pursuant to 38 U.S.C. § 4302.

## V.   VIOLATIONS OF USERRA

## (COUNT 1 VIOLATION OF 38 U.S.C. § 4302(b))

167.   Defendants violated 38 U.S.C. § 4302(b) of USERRA, among other ways, by:

a.   Maintaining a military leave policy that violates the provisions of USERRA;

b.   Imposing additional employment requirements on Sergeant O'Connell in contravention of 38 U.S.C. § 4316(d);

c.   Imposing additional employment requirements on Sergeant O'Connell in contravention of 20 C.F.R. § 1002.121; and

d.   Imposing additional employment requirements on Sergeant O'Connell in contravention of 20 C.F.R. § 1002.85(c).

## (COUNT 2 VIOLATION OF 38 U.S.C. § 4311(a))

168.     Defendants violated 38 U.S.C. § 4311(a) of USERRA, among other ways, by:

a.  Denying Sergeant O'Connell pay and benefits of employment based on Sergeant O'Connell's obligation to perform military service; and

b.  Imposing additional prerequisites to employment benefits based on Sergeant O'Connell's obligation to perform military service;

## (COUNT 3 VIOLATION OF 38 U.S.C. § 4311(b))

169.   Defendants violated 38 U.S.C. § 4311(b) of USERRA, among other ways, by:

a.  Taking adverse employment actions against Sergeant O'Connell following Sergeant O'Connell's complaint to TBPD that TBPD was violating his rights under USERRA;

b.  Taking adverse employment actions against Sergeant O'Connell following Sergeant O'Connell's complaint to DOL/VETS that TBPD was violating his rights under USERRA; and

c. Denying Sergeant O'Connell proper pay and benefits of employment in retaliation for Sergeant O'Connell's exercise of his rights under USERRA.

d. Denying Sergeant O'Connell' promotion.

### (COUNT 4 VIOLATION OF 38 U.S.C. § 4316(d))

170.   Defendants violated 38 U.S.C. § 4316(d) of USERRA, among other ways, by denying Sergeant O'Connell paid leave.

### (LIQUIDATED DAMAGES UNDER 38 U.S.C. § 4323(d))

171.   Sergeant O'Connell is entitled to liquidated damages under 38 U.S.C. § 4323(d) of USERRA because:

a. Sergeant O'Connell gave Defendants multiple warnings that their actions violated USERRA;

b. Defendants knew of Sergeant O'Connell's USERRA rights;

c. Defendants recklessly disregarded Sergeant O'Connell's rights and warnings;

d. Defendants recklessly disregarded the obligations of their own contracts with the United States, if any; and

e. Defendants recklessly disregarded their own posted USERRA workplace notices.

## VI.    PRAYER FOR RELIEF

Sergeant O'Connell respectfully prays that judgment be entered against Defendants on all claims and this Court award the following relief:

A.     Declare that the TBPD military leave policy violates USERRA.

B.     Declare that Defendants violated USERRA § 4302, 4311(a), 4311(b) and 4316(d);

C.     Require that Defendants compensate Plaintiff for any losses of wages or benefits in the amount to be proven at trial including back pay, front pay, pre and post judgment interest, lost benefits of employment, negative tax consequences of any award, liquidated damages, exemplary damages, and punitive damages as provided by law.

D.     Require Defendants to pay Plaintiff liquidated damages in amount to be proven at trial.

E.     Require Defendants to pay Plaintiff's attorney's fees, expert witness fees, and costs, pursuant to 38 U.S.C. § 4323, and as otherwise provided by law.

F.     Enter an injunction preventing TBPD and the other Defendants from imposing additional employment requirements on Sergeant O'Connell in contravention of 38 U.S.C. § 4316(d); 20 C.F.R. § 1002.121; and 20 C.F.R. § 1002.85(c).

E.      Pursuant to Rule 54(c), grant all relief to which Plaintiff is entitled and for such other and further relief as this Court deems just and equitable, including injunctive relief to preserve Sergeant O'Connell's benefits of employment and to enjoin future violations of the USERRA under 38 U.S.C. § 4323.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38 or any similar rule of law, Plaintiff demands a trial by jury for all causes of action and issues for which trial by jury is available.

Respectfully submitted this January 8, 2021.

Colin M. Downes
BLOCK & LEVITON LLP
1735 20th St., N.W.
Washington, DC 20009
Tel: (202) 734-7046
Email: colin@blockleviton.com

THOMAS G. JARRARD
LAW OFFICE OF THOMAS G. JARRARD, PLLC
*PRO HAC VICE TO BE FILED*
1020 North Washington Street
Spokane, WA 99203
Telephone:  425 239-7290

ROBERT W. MITCHELL
*PRO HAC VICE TO BE FILED*
Robert Mitchell, Attorney at Law, PLLC
1020 North Washington Street
Spokane, WA 99203
Telephone:  509-327-2224

*Attorneys for Plaintiff*