UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD O'CONNELL**,**

                                        Plaintiff,

        -against-

TOWN OF BEDFORD, MELVIN PADILLA,
*individually*, and MICHAEL CALLAHAN,
*individually*,

                                        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __09/12/2022__

No. 21 Civ. 170 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

        Plaintiff Richard O'Connell, a police sergeant with Defendant Town of Bedford, brings this action under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301 *et seq.*, alleging that the Town and individual Defendants Melvin Padilla, the chief of police, and Michael Callahan, a police lieutenant, (i) maintain a military leave policy that violates USERRA; (ii) denied him benefits of employment based on his military service obligation; and (iii) retaliated against him after he exercised his rights under USERRA. Presently pending before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint ("SAC," ECF No. 43) under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 48.) For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss.

# BACKGROUND

## I. Factual Background

The following facts are derived from the SAC and the documents referenced therein, which are all taken as true and constructed in the light most favorable to Plaintiff for the purposes of this motion.[1, 2]

### A. *Plaintiff begins his employment at the Town's Police Department; enlists in the Coast Guard Reserve*

On February 1, 2012, Plaintiff began working for the Town's Police Department ("TBPD"). (SAC ¶ 35.) On September 2, 2015, Plaintiff was promoted to the police rank of sergeant. (*Id.* ¶ 47.) In March 2018, the United States Coast Guard approved Plaintiff for enlistment in the Coast Guard Reserve. (*Id.* ¶ 48.)

In June 2018, Plaintiff received orders for Coast Guard training, and immediately emailed notice to his supervisor, Callahan. (*Id.* ¶ 58.) The next month, July 2018, Plaintiff was to leave to

---

[1] "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991)). Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint. *Id.* Additionally, a district court "may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) (citations omitted).

[2] The Court notes that some of Plaintiff's allegations seem to fail to include certain salient facts, which make it difficult to comprehend if certain events occurred in-between some of the allegations. To be sure, for purposes of this motion, the Court recognizes that it must accept all factual allegations in the SAC as true and draw all reasonable inferences in Plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). However, the [C]ourt cannot simply 'fill in the blanks' to supply what is missing, on a motion to dismiss," *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 357 (W.D.N.Y. 2018), "or follow a bread crumb trail of a represented plaintiff." *Jackson v. Cnty. of Onondaga*, No. 917CV845GLSCFH, 2019 WL 355729, at *4 (N.D.N.Y. Jan. 28, 2019). Put differently, at this stage, the Court is not required to either speculate or puzzle out Plaintiff's allegations in such a way that the Court would be effectively pleading his claims for him. As such, the following facts constitutes a compilation of the allegations as presented in Plaintiff's SAC.

attend initial training with the Coast Guard. (*Id.* ¶ 59.) On August 10, 2018, Plaintiff returned to work at the TBPD. (*Id.* ¶ 60.) That same day, Callahan directed Plaintiff to direct all military leave requests to his attention. (*Id.* ¶ 61.)

  B. *Defendants allegedly deny Plaintiff's "shift swap" requests in late 2018*

  Under a collective bargaining agreement with the TBPD, its police officers can do "shift swaps" with officers of equal rank. (*Id.* ¶ 63.) Callahan handled police officer scheduling and leave requests, among other things, which are granted, when necessary, in conjunction with Padilla's approval. (*Id.* ¶ 64.) Plaintiff claims that shift swap requests can be made as far as 60 days in advance of the dates requested, and that these requests are "always" approved upon receipt. (*Id.* ¶¶ 65–66.) In October 2018, Plaintiff submitted shift swap requests with two other sergeants. (*Id.* ¶ 70.) The shift swap requests were not approved upon receipt. (*Id.* ¶ 36.)

  On November 4, 2018, Plaintiff notified Callahan of his upcoming monthly military drill dates. (*Id.* ¶ 72.) Callahan directed Plaintiff to provide documentation regarding his drill obligation. (*Id.* ¶ 73.) Plaintiff explained to Callahan that no such documentation exists for short-term military duty. (*Id.* ¶ 74.)

  On November 14, 2018, Plaintiff's shift swap requests had yet to be approved. (*Id.* ¶ 75.) Another sergeant told Plaintiff that Callahan had told him he was withholding approval because Plaintiff was in the military, for which he wanted to ensure that Plaintiff "will be there for the dates in question." (*Id.* ¶ 76.) Plaintiff later inquired with Callahan about his withholding of approval for the shift wrap requests, and advised him that treating him with any form of bias based on military obligations is against the law. (*Id.* ¶ 78.) According to Plaintiff, Padilla later ratified Callahan's decision to withhold approval for the shift swap requests. (*Id.* ¶ 79.)

  On December 19, 2018, Padilla told Plaintiff that Callahan decided to withhold the shift swap requests "until 7 days prior to the requested change, to ensure that" Plaintiff was "not on

military leave for that date." (*Id.* ¶ 80.) According to Plaintiff, after he advised Padilla that such conduct was discriminatory, Padilla replied: "Well you are the only one in the military." (*Id.* ¶¶ 81–82.)

### C.    *Defendants allegedly demand documentation for all of Plaintiff's military duty dating back to January 2019*

On October 23, 2019, Callahan emailed Plaintiff and "demanded" documentation for all military duty dating back to January 2019. (*Id.* ¶ 86.) Plaintiff responded that he does not receive formal documentation of regular drills because that documentation is primarily only issued for schools or extended training. (*Id.* ¶ 87.) On December 31, 2019, Plaintiff sent Callahan an email providing him notice of his January military duty dates. (*Id.* ¶ 88.)

On January 14, 2020, Callahan emailed Plaintiff, stating in pertinent part: "As stated earlier – We need some type of documentation that you attended. You receiving a text and us getting an email is not sufficient." (*Id.* ¶ 89.) Three days later, Plaintiff returned to work and read the above message from Callahan, after which he immediately went to speak with Padilla. (*Id.* ¶ 91.) Plaintiff once again explained to Padilla that there was no such thing as formal orders for short term military duty, and citing 38 U.S.C. § 4312(f)(1) and 20 C.F.R. § 1002.121, a servicemember is not required to provide documentation to an employer for periods of service under 30 days. (*Id.* ¶ 83.) Plaintiff also explained, citing to USERRA, that "not only was an email notification sufficient, but a verbal notice alone is sufficient as well." (*Id.* ¶ 94.)

### D.    *Defendants allegedly retaliate against Plaintiff*

On January 19, 2020, Plaintiff filed a Department of Labor ("DOL")/Veterans' Employment and Training ("VETS") USERRA complaint. (*Id.* ¶ 97.) The next day, Plaintiff notified Padilla and Callahan of his USERRA complaint with the DOL. (*Id.* ¶ 98.) Plaintiff

provided them with the specific sections of USERRA that applied to their actions, as well as notified them that their demands for military documentation violated USRRA. (*Id.* ¶¶ 99, 101.)

On January 22, 2020, another lieutenant in the TBPD, Gruppuso, called Plaintiff into his office and allegedly stated in pertinent part, "I know exactly what's going on with you and I'm not involved." (*Id.* ¶ 102.) Gruppuso then verbally reprimanded Plaintiff for "an insignificant call in December 2019." (*Id.* ¶ 103.) He also denied Plaintiff's request to teach at Rockland County Police Academy, which he had done several times without issue, ultimately costing Plaintiff several hours of overtime. (*Id.* ¶ 104.) Gruppuso then handed Plaintiff a personnel evaluation for 2019, which was full of negative comments, including a discussion of a contractual language dispute and an alleged policy violation for a policy that "was not in existence at the time of the alleged incident." (*Id.* ¶ 106.) Plaintiff refused to sign the untruthful evaluation. (*Id.* ¶ 107.)

After his meeting with Gruppuso, Plaintiff filed a grievance against Padilla regarding the TBPD's Military Leave General Order that, according to Plaintiff, violates USERRA because it "requires documentation from the servicemember for periods of service that do not exceed 30 days." (*Id.* ¶ 108.) Plaintiff alleges that Padilla ignored the grievance completely. (*Id.* ¶ 109.)

On February 3, 2020, Plaintiff delivered the grievance to Town Supervisor Chris Burdick in accordance with the grievance procedures under the collective bargaining agreement between the TBPD and its officers. (*Id.* ¶ 110.) Plaintiff has yet to receive any response regarding his grievance, and the policy has not been changed. (*Id.* ¶ 112.) Plaintiff alleges that around the same time, members of the TBPD administrative staff began ignoring his routine requests and calls for work-related assistance. (*Id.* ¶ 115.)

On May 4, 2020, the DOL closed the VETS investigation into Plaintiff's DOL/VETS USERRA complaint by concluding that it did not "find that the evidence supports a violation of

USERRA," and it separately advised the Town's attorney that the "case had No Merit at this time." (Silverman Decl., Ex. B, ECF No. 49-2.)

From June 10 to July 2, 2020, Plaintiff attended training with the Coast Guard. (*Id.* ¶ 116.) On July 8, 2020, Padilla called Plaintiff into his office and issued him a written reprimand for not entering a call for service on April 24, 2020. (*Id.* ¶ 117.) Plaintiff alleges that he informed Gruppuso about the call for service at the time it occurred, after which Gruppuso specifically instructed Plaintiff "that there is nothing to do with the call." (*Id.* ¶ 119.) Plaintiff explained to Padilla that no call was generated for that reason. (*Id.* ¶ 120.) Padilla reprimanded Plaintiff nonetheless, and prevented Plaintiff from working any overtime for 30 days—a reprimand which Plaintiff describes as his first formal reprimand in 12 years and "the harshest punishment [Padilla] has ever dealt to a [TBPD] police officer." (*Id.* ¶¶ 121–23.) Plaintiff claims that "[t]his rarely imposed punishment" has only applied to very serious offenses, such as "showing up to work drunk, and driving a patrol car," and "refusing to attend a call for a dying toddler, and lying about being on-scene." (*Id.* ¶ 124.)

On August 19, 2020, Plaintiff received a notice of active-duty orders from the Coast Guard, directing him to begin military service on September 1, 2020. (*Id.* ¶ 126.) Plaintiff sent Callahan an email notifying him of his orders, to which Callahan responded "received." (*Id.* ¶¶ 127–28.) After starting his activity duty with the Coast Guard, Plaintiff received a phone call the next day from the TBPD's union attorney, John D'Alessandro, advising him that the Town's attorney, Jaclyn Goldberg, had contacted him and stated that "they received [Plaintiff's] military orders and will be following the law." (*Id.* ¶ 132.) D'Alessandro explained to Plaintiff that he would not receive pay, would lose health and dental insurance, and that the Town would probably not provide him a holiday check in accordance with the collective bargaining agreement. (*Id.* ¶ 133.)

Consequently, on September 3, 2020, Plaintiff directed his attorney to deliver a list of administrative "turn-over" instructions to the TBPD so that it had easy access to the systems he administered as part of his job responsibilities. (*Id.* ¶¶ 134–35.)

On September 9, 2020, Plaintiff submitted paid leave requests through the Town's attorney, Goldberg. (*Id.* ¶ 137.) On September 14, 2020, a coworker told Plaintiff that Padilla and Callahan would not be enforcing previously approved shift swaps that Plaintiff had made with other sergeants. (*Id.* ¶ 139.) "These Sergeants were working for [Plaintiff] without the accompanying monetary compensation for [Plaintiff]. Consequently [Plaintiff] worked over $1,000 of overtime for free." (*Id.* ¶¶ 140–41.) That same day, the TBPD also denied Plaintiff's paid leave requests. (*Id.* ¶ 143.)

The next day, Goldberg informed Plaintiff that while he is on active duty, he must submit his requests directly to Padilla or other commander via telephone, email, or U.S. mail. (*Id.* ¶ 145.) Plaintiff then emailed Padilla directly regarding his paid leave requests, but Padilla responded by stating that he must access the TBPD's personnel systems to request paid leave. (*Id.* ¶¶ 146–47.) Plaintiff's paid leave requests were still denied and he claims he and his family lost their dental coverage as a result. (*Id.* ¶¶ 148–49.)

E.    *Defendants allegedly deny Plaintiff's promotions and paid military leave*

In October 2019, Plaintiff took a lieutenant promotion test with four other officers, in which he placed number one on the resulting lieutenant promotion list. (*Id.* ¶ 150.) Over a year later, on December 1, 2020, Plaintiff attended a "chief's interview" with Padilla, Callahan, Gruppuso, and another lieutenant, Bellantone, for promotion to two positions: Detective Sergeant and Lieutenant. (*Id.* ¶¶ 151–52.)

With respect to the Detective Sergeant promotion, Padilla "is the only decision maker with regard" to such promotion. (*Id.* ¶ 155.) Callahan made a recommendation to Padilla regarding

Plaintiff's requested promotion to Detective Sergeant. (*Id.* ¶ 156.) With respect to the Lieutenant promotion, Padilla makes recommendation to the Town Board for such promotion, which he made with respect to Plaintiff's requested promotion. (*Id.* ¶¶ 153, 59.)

On December 1, 2020, Plaintiff interviewed with the Town Board for the Lieutenant promotion. (*Id.* ¶ 160.) Eight days later, Plaintiff was informed that he was passed over for both promotions, allegedly in favor of less qualified applicants. (*Id.* ¶ 161.)

On January 8, 2021, Plaintiff commenced the instant lawsuit and Defendants were served with the summons and complaint the next day. (*Id.* ¶¶ 162–63.) On February 4, 2021, Plaintiff sent military leave requests to Callahan, of which he denied forty hours of paid leave time based on Plaintiff's prior use of New York State military leave in 2020. (*Id.* ¶¶ 166–67.)

On March 2, 2021, Plaintiff again attended a "chief's interview" for the Lieutenant promotion, to which Padilla, Callahan, Bellantone, and another lieutenant, Sikoryak, attended. (*Id.* ¶¶ 168–69.) Padilla made a recommendation to the Town Board regarding Plaintiff's requested Lieutenant promotion. (*Id.* ¶ 172.) That same day, Plaintiff again interviewed with the Town Board for the requested Lieutenant promotion. (*Id.* ¶ 173.) On March 25, 2021, the Town Board announced that it was passing over Plaintiff again, in favor of the officers who placed numbers three (McGraw) and four (Gulick) in the lieutenant promotion list. (*Id.* ¶ 174.) According to Plaintiff, both of these officers were his subordinates who have a combined time in serve as sergeant less than himself. (*Id.*)

## II.  Procedural Background

On January 8, 2021, Plaintiff commenced this action by filing a complaint (ECF No. 1.) On March 25, 2021, Plaintiff filed his first amended complaint. (ECF No. 29.) On April 9, 2021, Defendants filed a letter seeking leave to file a motion to dismiss, which also stated the grounds on which Defendant would move for dismissal. (ECF No. 34.) Four days later, Plaintiff filed a

letter in opposition. (ECF No. 35.) The Court subsequently granted Defendants leave to file their motion and issued a briefing schedule by which Defendants would serve on Plaintiff their moving papers on May 14, 2021, Plaintiff would serve on Defendants his opposition papers on June 14, 2021, and Defendants would serve on Plaintiff their reply on June 29, 2021. (ECF No. 36.)

On June 2, 2021, sometime after Defendants had served their moving papers but before Plaintiff had to serve his opposition papers, Plaintiff attempted to file a second amended complaint without prior leave of court. (ECF No. 37.) The next day, Plaintiff filed a letter requesting leave to file his proposed second amended complaint. (ECF No. 39.) After Defendants reviewed Plaintiff's proposed filing, they did not oppose Plaintiff's application but also requested leave to file a motion to dismiss once Plaintiff filed the proposed second amended complaint. (ECF No. 41.) Accordingly, the Court granted Plaintiff leave to file a second amended complaint, granted Defendants leave to file their motion to dismiss, and issued a briefing schedule. (ECF No. 42.)

On June 17, 2021, Plaintiff filed his SAC. (SAC, ECF No. 43.) On September 2, 2021, the parties filed their respective briefing on the instant motion: Defendants filed their notice of motion (ECF No. 48), memorandum in support ("Motion," ECF No. 50) with an accompanying declaration with exhibits (Silverman Decl., ECF No. 49), and reply ("Reply," ECF No. 51); and Plaintiff filed his response in opposition ("Response in Opposition," ECF No. 46).

## LEGAL STANDARD

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC,* 734 F.3d 132, 137 (2d Cir. 2013). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

## DISCUSSION

In his SAC, Plaintiff asserts claims under USERRA against Defendants for: (1) maintaining a military leave policy that violates the statute by imposing additional employment requirements; (2) discriminating against Plaintiff by denying him benefits of employment based on his obligation to perform military service (namely, denying him military leave and shift swaps); and (3) retaliating against Plaintiff in a variety of ways after he filed a DOL/VETS complaint in January 2020, a grievance against Padilla in February 2020, and the instant lawsuit against them in January 2021. (*See* SAC at 21–23.)

USERRA prohibits discrimination based on a person's military status. *See Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 174 (2d Cir. 2011). "The purpose of USERRA is to encourage military service 'by eliminating or minimizing the disadvantages to civilian careers' . . . ." *Id.* (quoting 38 U.S.C. § 4301(a)). In particular, USERRA protects members of the uniformed services, including those who are military reserves, *see Mock v. City of Rome*, 910 F. Supp. 2d 429, 431 (N.D.N.Y. 2012), from discrimination on the basis of their military service, and provides, in relevant part, that:

> [a] person who is a member of, . . . has performed, . . . or has an obligation to perform service in a uniformed service shall not be denied . . . retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, . . . performance of service, . . . or obligation[.]

38 U.S.C. § 4311(a). It further provides, that

> [a]n employer shall be considered to have engaged in actions prohibited . . . if the person's membership . . . or obligation of service . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or obligation of service. . . .

38 U.S.C. § 4311(c)(1).

By their motion, Defendants argue that Plaintiff's claims fail because: (1) neither Padilla nor Callahan are subject to liability as an "employer" under USERRA; (2) as a matter of law, the Town's military leave policy on its face complies with USERRA[3]; (3) Plaintiff fails to plausibly plead a materially adverse employment action for his discrimination claims; and (4) Plaintiff fails to plausibly plead a retaliation claim under USERRA. (*See* Mot. at 17–31.) The Court addresses Defendants' arguments in that order.

---

[3] In a footnote in his opposition, Plaintiff contends that Defendants' motion does not address his claim that the Town's military leave policy violates USERRA. (Resp. in Opp'n at 6 n.1.) "The general rule in this circuit is that issues may not be raised for the first time in reply papers." *Rusis v. Int'l. Bus. Machines Corp.*, 529 F. Supp. 3d 178, 207 n.22 (S.D.N.Y. 2021) (citations omitted). However, that is not the case here.

To be sure, Defendants do not expressly designate an individual section to address such claim in their motion as they did in their reply. (*Compare* Mot. at 17–31, *with* Reply at 13–15.) But a review of Defendants' motion reveals that Defendants did address Plaintiff's claim that the Town's military leave policy violates USERRA within their arguments that Plaintiff fails to plausibly plead an adverse employment action. (*See* Mot. at 21–24; *see also id.* at 21 ("[T]he Police Department was permitted under New York State Military Law Sections 242 and 243 to request written military orders from the Plaintiff."); *id.* at 22 ("The Police Department's request for military orders was also supported by well-established case-law. 'It is undisputed that it is generally appropriate for an employer to request documentation for military leave.' *O'Connell v. New Jersey Turnpike Authority*, 2015 WL 1567477 (D.N.J. Apr. 7, 2015) . . . .").) Indeed, even if Defendants did not explicitly designate certain arguments to argue for dismissal of Plaintiff's relevant claim, Defendants' arguments nonetheless, at best, implicitly argue for dismissal of such claim. Accordingly, the Court "finds it appropriate to consider" whether dismissal of Plaintiff's relevant claim is warranted. *Rusis*, 529 F. Supp. 3d at 207 n.22 (finding appropriate to consider dismissal argument first implicitly raised by motion and then explicitly reiterated by reply).

I.        **Whether Padilla and Callahan are "employers" under USERRA**

Defendants first argue that all claims against Padilla and Callahan in their individual capacity must be dismissed because Plaintiff fails to plausibly allege that they meet USERRA's definition of "employer." (Mot. at 17–20.) The Court disagrees.

USERRA defines an "employer" as:

any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities, including—

(i) a person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities;

(ii) the Federal Government;

(iii) a State;

(iv) any successor in interest to a person, institution, organization, or other entity referred to in this subparagraph; and

(v) a person, institution, organization, or other entity that has denied initial employment in violation of section 4311.

38 U.S.C. § 4303(4)(A). Likewise, USERRA's accompanying regulations provide that an employer includes "any person . . . that has control over employment opportunities . . . ." 20 C.F.R. § 1002.5(d)(1).

Courts have held that an individual defendant may be held personally liable under USERRA if his conduct satisfied the statute's definition of "employer." *See Risner v. Ohio Dep't of Rehab. & Corr.*, 577 F. Supp. 2d 953, 967 (N.D. Ohio 2008) (citing cases). For example, courts directly considering the issue have held that individuals who have authority or input over hiring and firing or promotion are "employers" under USERRA. *See, e.g.*, *Croft v. Village of Newark*, 35 F. Supp. 3d 359, 368 (W.D.N.Y. 2014) (concluding that police chief could be considered "employer" under USERRA because he made promotional recommendations to the Village Board and was responsible for selecting individuals to be interviewed for the vacant sergeant positions);

*Angiuoni v. Town of Billerica*, 999 F. Supp. 2d 318, 322 (D. Mass. 2014) (concluding that police chief could be considered "employer" under USERRA because he "[was] delegated the responsibility of placing Department employees on administrative leave and recommending them for termination even if the Town makes the final decision"); *Baldwin v. City of Greensboro*, No. 1:09CV742, 2010 WL 3211055 at *4 (M.D.N.C. Aug. 12, 2010), *report and recommendation adopted in relevant part*, 2010 WL 9904879, at *1–2 (M.D.N.C. Oct. 15, 2010), (concluding that individuals, who were in plaintiff's supervisory chain of command, involved in preparing plaintiff's performance evaluations, plaintiff's daily supervision, and in the events that ultimately caused plaintiff's termination could be considered an "employer" under USERRA); *Brandsasse v. City of Suffolk, Va.*, 72 F. Supp. 2d 608, 618 (E.D. Va. 1999) ("concluding that city's director of personnel could be considered "employer" under USERRA because plaintiff alleged that he denied his requests for accommodation and that the meeting between plaintiff and director was the basis of the alleged pretextual investigation against him).

But courts have found that individual defendants do not meet USERRA's definition of "employer" when the individual defendants were neither involved in making the ultimate decisions in hiring, firing, or promotion, nor in influencing those who made the ultimate decision. *See, e.g., Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 531 (S.D.N.Y. 2017) (rejecting plaintiff's claims that individuals were "employers" under USERRA because they were neither "involved in the ultimate decision not to promote Plaintiff to the rank of Lieutenant," nor "compelled the members of the Committee to do so"); *Satterfield v. Borough of Schuylkill Haven*, 12 F. Supp. 2d 423 (E.D. Pa. 1998) (dismissing claims against individual defendants because plaintiff was not required to report to any of them directly).

With that in mind, contrary to Defendants' arguments, the Court concludes here that Plaintiff sufficiently alleges that Padilla and Callahan are "employers" under USERRA. With respect to Padilla, Plaintiff alleges that he is the Chief of the TBPD, who is his ultimate supervisor and who also decides and recommends promotions to the Town Board (such as for Lieutenant promotions) and controls works hours. (SAC ¶¶ 9–11, 153.) Plaintiff also alleges that Padilla prevented him from working overtime for 30 days as punishment and chose not to enforce previously approved shift swaps Plaintiff had made with other sergeants. (*Id.* ¶¶ 123, 139.) And with respect to Callahan, Plaintiff alleges that he is a lieutenant at the TBPD, his direct supervisor, and who recommends certain promotions to the Chief (such as for Detective promotions) and controls works hours. (*Id.* ¶¶ 12–14, 156.) Plaintiff also alleges that Callahan chose not to enforce previously approved shift swaps Plaintiff had made with other sergeants and also denied him forty hours of paid leave time. (*Id.* ¶¶ 139, 167.)

While Defendants argue that neither Padilla nor Callahan had the authority to hire or fire employees because that authority rested with the Town Board, as noted above, several courts, including one within this circuit, have held that an individual defendant can also meet USERRA's definition of "employer" when they have *input* over hiring and firing or promotion, which Plaintiff sufficiently alleges here. *See Croft*, 35 F. Supp. 3d at 368; *Angiuoni*, 999 F.Supp.2d at 322; *Baldwin*, 2010 WL 3211055 at *4, *report and recommendation adopted in relevant part*, 2010 WL 9904879, at *1–2. At any rate, construing Plaintiff's allegations in his favor, "[a]lthough the allegations made against [Callahan and Padilla] may ultimately fail, the [C]ourt is unable to conclude, at the Rule 12(b)(6) stage, that [they] should escape liability under USERRA." *Brandsasse*, 72 F. Supp. 2d at 618.

**II.    Whether the Town's Military Leave Policy On Its Face Violates USERRA**

Defendants next argue that Plaintiff's claim that the Town's military leave policy violates USERRA because, as a matter of law, such policy on its face complies with USERRA. (Mot. at 21–24; Reply at 13–15.) The Court agrees.

In his SAC, Plaintiff claims that the Town's military leave policy violates USERRA because, "in contradiction of USERRA," the policy "requires documentation from the servicemember for periods of service that do not exceed 30 days." (SAC ¶ 108; *see also id.* ¶ 93 (citing 38 U.S.C. § 43(f)(1); 20 C.F.R. § 1002.121).) The specific policy Plaintiff refers to is TBPD General Order § 103-9, entitled "Military Leave," which provides the following:

> Military Leave
>
> A member requesting Military Leave shall submit the receipt of military orders to report to the appropriate Division Commander. Military Leave shall be granted in compliance with section 242.5 of the New York State Military Law. The Administrative Division Commander shall complete the appropriate entry in the department electronic time and attendance system.

(Silverman Decl., Ex. D at 4, ECF No. 49-4.) In turn, section 242.5 of the New York State Military Law provides in relevant part:

> 5. Pay for military duty. (a) Every public officer or employee shall be paid his or her salary or other compensation as such public officer or employee for any and all periods of absence while engaged in the performance of ordered military duty, and while going to and returning from such duty, not exceeding a total of thirty days or twenty-two working days, whichever is greater, in any one calendar year and not exceeding thirty days or twenty-two working days, whichever is greater, in any one continuous period of such absence.

N.Y. Mil. Law § 242(5)(a).

It follows then, that because TBPD General Order § 103-9 expressly refers to New York Military Law § 242.5, its use of the term "Military Leave" means the compensation that the employee can receive for his or her "periods of absence while engaged in the performance of ordered military duty." *Id.* Hence, when TBPD General Order § 103-9 requires an employee to

"submit the receipt of military orders" and conditions the "grant[ing]" of "Military Leave" to compliance with New York Military Law § 242.5, it does so for purposes of determining the amount of compensation owed to the employee for those "periods of absence while engaged in the performance of ordered military duty." *Id.*; *see also* 38 U.S.C. § 4316(b) (providing that "a person who is absent from a position of employment by reason of service in the uniformed services shall be deemed to be on furlough or leave of absence while performing such service[,] and entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service.").

A relevant opinion from the New York State Comptroller seems to further support this conclusion:

> The extent to which a municipal employee will be entitled to compensation under Military Law, §242(5) depends upon the employee's work schedule and how extensive the conflict, if any, between his or her work days and military duty. If an employee's first 30 calendar days of ordered military duty do not include at least 22 working days, the employee is entitled to be compensated for military leave for 22 working days. Conversely, if the employee's first 30 calendar days of ordered military duty include more than 22 working days, the employee is entitled to compensation for all those working days, notwithstanding that they total more than 22. Thus, in some instances, an employee will be entitled to compensation for more than 22 working days, although in no case for more than 30.

> For each officer or employee entitled to military leave, the [municipality] should maintain, in effect, two calendars: one to count calendar days of ordered military duty and the other to count work days which coincide with the ordered military duty.

N.Y. Op. State Compt. 91-40.

On that basis, TBPD General Order § 103-9 on its face does not violate USERRA. "It is undisputed that it is generally appropriate for an employer to request documentation for military

leave." *O'Connell v. New Jersey Turnpike Auth.*, CIV.A. 12-49 ES JAD, 2015 WL 1567477, at

*13 (D.N.J. Apr. 7, 2015), *vacated and remanded on other grounds*, 649 F. App'x 280 (3d Cir.

2016). That is because "USERRA does not prohibit employers from requiring certain notification

procedures or documentation of military leave." *Brooks v. Fiore*, No. 00–803, 2001 WL 1218448,

at *10 (D. Del. Oct. 11, 2001) *aff'd*, 53 F. App'x 662 (3d Cir. 2002).

      To be sure, an "employee is not required to ask for or get his or her employer's permission

to leave to perform service in the uniformed services. The employee is only required to give the

employer notice of pending service." 20 C.F.R. § 1002.87. "The notice may be informal," can be

"either verbal or written," and "does not need to follow any particular format." 20 C.F.R. §

1002.85(c); *see also* 38 U.S.C. § 4312(a)(1) (providing that the employee need only "give[ ]

advance written or verbal notice of such service to such person's employer." 38 U.S.C. §

4312(a)(1)). And "[a]lthough USERRA does not specify how far in advance notice must be given

to the employer, an employee should provide notice as far in advance as is reasonable under the

circumstances." 20 C.F.R. § 1002.85(d). But "no notice is required . . . if the giving of such notice

is precluded by military necessity or, under all of the relevant circumstances, the giving of such

notice is otherwise impossible or unreasonable." *Id.* § 4312(b).

      Further, an employee is "required to submit documentation to the employer in connection

with [an] application for reemployment . . . if the period of service exceeded 30 days and if

requested by the employer." 20 C.F.R. § 1002.121. That is because under USERRA,

> [t]o demonstrate entitlement to reemployment [after periods of service longer than
> 30 days], veterans need only show that they meet the reemployment provisions'
> four prerequisites: proper notice to his employer in advance of his departure, a
> service period of less than five years, a timely request for reemployment
> accompanied by proper documentation, and a separation from military service
> under "honorable conditions."

*Petty v. Metro. Govt. of Nashville & Davidson Cnty.*, 687 F.3d 710, 716–17 (6th Cir. 2012) (citing

38 U.S.C. § 4312); *see also Bradberry v. Jefferson Cnty., Tex.*, 732 F.3d 540, 546 (5th Cir. 2013)

("Documentation of the military service may also be demanded by the employer, though

reemployment is to occur immediately and the adequacy of documentation reviewed thereafter."

(citing 38 U.S.C. § 4312(f); 20 C.F.R. §§ 1002.122–1002.123).

However, "USERRA does not require persons who serve less than 31 days to submit

documentation to their employer upon return from a leave of absence" for purposes of

"*reemployment*." *Huntsman v. S.W. Airlines Co.*, 19-CV-00083-PJH, 2021 WL 391300, at *13

(N.D. Cal. Feb. 3, 2021) (citing 38 U.S.C. §§ 4312(e), (f), 4316(e)(2); 20 C.F.R. § 1002.121). And

because "USERRA establishes a floor, not a ceiling, for the employment and reemployment rights

and benefits of those it protects," no "State law (including any local law or ordinance), contract,

agreement, policy, plan, practice, or other matter" may impose such a requirement. 20 C.F.R. §

1002.7(a), (b) ("USERRA supersedes any State law (including any local law or ordinance),

contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any

manner any right or benefit provided by USERRA, including the establishment of additional

prerequisites to the exercise of any USERRA right or the receipt of any USERRA benefit.").

Yet, none of USERRA's provisions or regulations that Plaintiff cites in his SAC (*see* SAC

¶ 189), expressly contain, or even implicitly suggest, the broad prohibition Plaintiff construes from

them—namely, that employers may not "require[] documentation from the servicemember for

periods of service that do not exceed 30 days" under no circumstances whatsoever. (*Id.* ¶ 108.) In

fact, USERRA does allow employers to require documentation of military leave less than 31 days

for purposes *other than* "*reemployment*," such as, for example, "providing pension benefits under

§ 4318(a)(2)(A)[,]" *Espinoza v. City of Seattle*, 458 F. Supp. 3d 1254, 1281 (W.D. Wash. 2020),

*appeal dismissed*, 20-35506, 2020 WL 7062684 (9th Cir. Sept. 15, 2020), or "to properly document . . . military service time . . . to account for any pay differential for which [the employee] might be eligible under [the employer's] *voluntary* policy of paying its employees the difference between any military pay received and their usual pay during periods of military service[,]" *Brooks*, 2001 WL 1218448, at \*10 (emphasis in original).

Therefore, as Plaintiff fails to identify any language in either USERRA's provisions or regulations from which the Court could sufficiently draw a reasonable inference in his favor that the TBPD General Order § 103-9 on its face violates the statute, the Court concludes that Plaintiff's relevant claim fails and must be dismissed accordingly.

### III.   Whether Plaintiff Plausibly Alleges an Adverse Employment Action For His Discrimination Claims

Defendants next argue that Plaintiff fails to plausibly allege that he suffered an adverse employment action to sufficiently state a discrimination claim under USERRA. (Mot. at 20.) The Court agrees.

To state a discrimination claim under USERRA, a plaintiff must allege sufficient facts to establish "a *prima facie* case of discrimination by showing . . . that his protected status was 'a substantial or motivating factor in the adverse [employment] action." *Gummo v. Village of Depew*, 75 F.3d 98, 106 (2d Cir. 1996) (quoting *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401 (1983)); *see also id.* (noting that Congress explicitly adopted "the scheme of burden-of-proof allocations approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S. Ct. 2469, 76 L.Ed.2d 667 (1983)").

"A motivating factor . . . is not necessarily the sole cause of the action, but rather it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Fink v. City of New York*, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001) (quoting *Sanguinetti v. United Parcel*

*Serv., Inc.*, 114 F. Supp. 2d 1313, 1318 (S.D. Fla. 2000)) (collecting cases from other districts) (internal quotation marks omitted). It is something that "the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Id.* (quoting *Robinson v. Morris Moore Chevrolet–Buick, Inc.*, 974 F. Supp. 571, 576 (E.D. Tex. 1997)). It "may be proven through direct or circumstantial evidence." *Woodard v. N.Y. Health & Hosps. Corp.*, 554 F. Supp. 2d 329, 349 (E.D.N.Y. 2008).

USERRA, however, does not define the term "adverse employment action." *See Schmauch v. Honda of Am. Mfg., Inc.*, 295 F. Supp. 2d 823, 838 (S.D. Ohio 2003). But as the United States Supreme Court has previously stated:

> when Congress uses language with a settled meaning at common law, Congress "presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."

*Beck v. Prupis*, 529 U.S. 494, 500–501 (2000) (citing *Morissette v. United States*, 342 U.S. 246, 263 (1952)). Accordingly, because Congress did not define "adverse employment action" in USERRA, the Court must look to commonly accepted definitions for guidance.

As another court previously noted, "[t]he phrase 'adverse employment action' is a term of art within employment discrimination law." *Schmauch*, 295 F. Supp. 2d at 838. In the Second Circuit, an "adverse employment action" is a "materially adverse change" in the terms and conditions of employment." *Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citations omitted). In turn,

> [t]o be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. . . . Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

*Id.* (citations omitted). A materially adverse change in working conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (citations omitted). "Examples of actionable adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less important title, a loss of important benefits, or significantly reduced responsibilities." *Id.*

As such, it logically follows that in an USERRA action, "a loss of a benefit of employment § 4311(a) constitutes an adverse employment action, so long as the loss is material." *Woodard*, 554 F. Supp. 2d at 347, *aff'd in part and remanded on other grounds*, 350 F. App'x 586 (2d Cir. 2009) (summary order). Under USERRA,

> [t]he term "benefit", "benefit of employment", or "rights and benefits" means the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2).

Here, by his discrimination claims, Plaintiff alleges that Defendants took two alleged adverse employment actions against him: (1) demanding documentation of his military duty in violation of USERRA; and (2) withholding approval of shift swaps. But Defendants are correct that Plaintiff fails to plausibly allege an adverse employment action because his own allegations, even when construed in his favor, indicate that Defendants never denied him a benefit of employment. Put another way, Plaintiff's allegations indicate that he did not suffer "a loss of a benefit of employment"—much less one that is material. *Woodard*, 554 F. Supp. 2d at 347.

First, as already discussed above, neither USERRA nor its accompanying regulations contain the broad prohibition on requests for documentation that Plaintiff construes from them. Indeed, a review of the relevant allegations reveals that Plaintiff seems to conflate four types of USERRA provisions that each serve a different purpose: (1) the prohibition against employees needing permission to leave for military duty (20 C.F.R. § 1002.87); (2) the notice sufficiency requirements (38 U.S.C. § 4312(a)(1); 20 C.F.R. § 1002.85); (3) the documentation requirements for purposes of reemployment (38 U.S.C. § 4312(f); 20 C.F.R. §§ 1002.121–1002.123); and (4) the specifications allowing employers to request documentation for purposes other than reemployment (38 U.S.C. § 4316–18). (*Compare* SAC ¶¶ 86–89 (alleging that Callahan wrongfully "demanded" documentation of military duty "*dating back to January 2019*" and told him that texts and emails were "not sufficient" documentation that he *previously* performed military duty) (emphasis added), *with id.* ¶¶ 93–94 (alleging that he told Padilla, citing to USERRA, that "a servicemember is not required to provide documentation to an employer for periods of service under 30 days" and that "not only was an email notification sufficient, but a verbal notice alone is sufficient as well").

To that end, as Defendants correctly note, nowhere does Plaintiff allege in the SAC, even when drawing all inferences in his favor, that he was ever denied permission to perform his military duty or that he was ever required to provide documentation for his leaves of absence for a prohibited purpose. Instead, Plaintiff's relevant allegations—even when construed in his favor— only indicate that Defendants requested documentation of military duty for a purpose that did not violate USERRA's provisions—namely, to determine the amount of paid military leave he would receive under New York State Military Law § 242. (*See, e.g., id.* ¶ 86 (alleging that Callahan "demanded" documentation of his military duty "*dating back to January 2019*") (emphasis added),

*id.* ¶ 89 (alleging that Callahan told Plaintiff "As stated earlier—We need some type of documentation *that you attended.* You receiving a text and us getting an email is not sufficient."); *id.* ¶ 108 (quoting TBPD General Order § 103-9).)

And second, nowhere in his relevant allegations does Plaintiff allege that Defendants *denied* one of his requests to swap shifts with another sergeant. Instead, Plaintiff only alleges that his shift swap requests were not approved upon receipt—as it is purportedly customary—and that Defendants withheld approval of the shift swap requests "until 7 days prior to the requested change." (SAC ¶¶ 70–71, 75–80.) At best, when construed in his favor, Plaintiff alleges that the "loss of benefit" he suffered as a result of this delayed approval was the "significant disadvantage with his peers because they will no longer want to swap shifts with him if doing so requires his peers to not receive approval until a week prior." (*Id.* ¶ 83.) But as Plaintiff does not allege that he was unable to swap shifts with one of his peers precisely because of the delayed approval, then his allegation that Defendants put him at a "significant disadvantage" is not only speculatory but also insufficient to plausibly plead a "loss of benefit."

Accordingly, the Court dismisses Plaintiff's discrimination claims under 38 U.S.C. § 4311(a) for failing to plausibly allege that he suffered "a [material] loss of a benefit of employment." *Woodard*, 554 F. Supp. 2d at 347.

## IV.    Whether Plaintiff Plausibly Alleges a Retaliation Claim

Defendants finally argue that Plaintiff fails to state a retaliation claim against them because, while he alleges that he engaged in protected activity, Plaintiff fails to sufficiently allege any nexus between such protected activity and the alleged adverse employment actions by Defendants. (Mot. at 29–31.) After due consideration, the Court disagrees.

"In addition to acts of discrimination, . . . USERRA further prohibits an employer from taking an adverse employment action against any person in retaliation for enforcing his USERRA rights." *Davis v. New York City Dep't of Corrections*, 17-CV-3863 (MKB), 2017 WL 5634123, at *7 n.8 (E.D.N.Y. Nov. 22, 2017) (internal quotation marks and citations omitted); 38 U.S.C. § 4311(b). "To make out a *prima facie* case of retaliation under USERRA, a plaintiff must show that (1) he was engaged in protected activity; (2) that the employer was aware of that activity; (3) that the plaintiff suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." *Kassel*, 272 F. Supp. 3d at 537 (citations omitted). "A plaintiff may demonstrate a causal connection under the fourth element '(a) indirectly by showing that the protected activity was followed closely by discriminatory treatment; (b) indirectly though other evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (c) directly through evidence of retaliatory animus.'" *Id.* (citations omitted).

Here, Defendants do not appear dispute that Plaintiff's allegations establish the first and second elements of a *prima facie* case of retaliation: that he was engaged in protected activity and that the employer was aware of that activity. Specifically, Plaintiff first alleges that on January 19, 2020, he filed a DOL/VETS USERRA complaint and notified Defendants about it. (SAC ¶¶ 97–98.) Plaintiff also alleges that he filed a separate grievance against Padilla "regarding the TBPD's Military Leave General Order" and that he delivered the grievance to a Town Supervisor. (*Id.* ¶¶ 108–10.) Plaintiff further alleges that he filed the instant lawsuit against Defendants on January 8, 2021, and that Defendants were served with the summons and complaint the next day. (*Id.* ¶¶ 162–63.) Rather, Defendants argue that Plaintiff's allegations fail to establish the third and fourth *prima facie* elements: that he suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse action. (Mot. at 29–31.)

24

As for the alleged adverse employment actions Defendants took against him *after* he engaged in protected activity, Plaintiff alleges that such actions include: (1) a verbal reprimand, a negative evaluation, and a denial to teach at Rockland County Police Academy (SAC ¶¶ 102–07); (2) a written reprimand and a denial of overtime for not entering a call for service in April 2020 (*id.* ¶¶ 117–24); (3) not enforcing previously approved swaps (*id.* ¶¶ 139–41); (4) a denial of paid military leave (*id.* ¶¶ 142–49, 167); (5) directing Plaintiff to submit requests for paid military leave through TBPD's personnel systems (*id.* ¶¶ 145–49); (6) the denial of two promotions to Lieutenant, first in December 2020 and then in March 2021 (*id.* ¶¶ 150–54, 159–61, 168–75); and (7) the denial of promotion to Detective in December 2020 (*id.* ¶¶ 151, 155, 161). But from these seven actions, the Court is of the view that, when drawing all inferences in his favor, Plaintiff only plausibly alleges that 3, 6, and 7 constitute adverse employment actions.

To begin, courts have consistently held that reprimands and negative evaluations, without more, are not adverse employment actions. *See, e.g.*, *Billings v. New York State Dep't of Corrections and Cmty. Supervision*, 19-CV-11796 (NSR), 2021 WL 4150925, at *5 (S.D.N.Y. Sept. 10, 2021) ("[T]here are no allegations that this informal reprimand led to any further consequences or altered Plaintiff's employment."); *Brown v. City of New York*, 2014 WL 5394962, at *8 (S.D.N.Y. Oct. 23, 2014) ("A negative evaluation or official reprimand may, in some circumstances, constitute adverse employment action . . . but only when it triggers negative consequences to the conditions of employment." (internal quotations omitted)); *Crews v. City of Ithaca*, 3:17-cv-00213 (MAD/DEP), 2018 WL 1441282, at *5 (N.D.N.Y. Mar. 21, 0218) ("[A] complaint must allege more than just the existence of a reprimand to establish an adverse action, it must also allege facts that indicate a demonstrably adverse employment consequence.").

Additionally, while "[c]ourts in this Circuit have found that the denial of overtime, where accompanied by a loss in compensation or other material harm, may constitute an adverse employment action," vague and conclusory allegations are insufficient. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 406 (S.D.N.Y. 2014); *see also Aiello v. Stamford Hosp.*, No. 09 Civ. 1161(VLB), 2011 WL 3439459, at *12 (D. Conn. Aug. 8, 2011) (collecting cases); *Little v. National Broadcasting Co., Inc.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (noting plaintiff could be subject to an adverse employment action where he produced evidence he incurred an actual loss in income because of lost overtime even though he remained at the same pay level); *Faggiano v. Eastman Kodak Co.*, 378 F. Supp. 2d 292, 306 (W.D.N.Y. 2005) (finding plaintiff suffered an adverse employment action where he lost opportunities for earning overtime benefits and his title and job duties were altered.).

To that end, even when taking Plaintiff's allegations as true, Gruppuso's verbal reprimand and negative evaluation, as well as Padilla's written reprimand, are not "adverse employment actions." Further, while Plaintiff alleges that Gruppuso's denial of his request to teach at Rockland County Police Academy "cost [him] several hours of overtime" (SAC ¶ 104), and that Padilla "prevented [him] from working any overtime for 30 days" (*id.* ¶123), such allegations are vague and conclusory. For example, as alleged, it is unclear how many hours of overtime Plaintiff would have obtained, how much he would have earned from those hours (or how much loss in income he incurred), and how it would have compared to other instances in which he had obtained overtime *before* he engaged in protected activity. *See, e.g.*, *Henry* 18 F. Supp. 3d at 406 ("But Henry fails to allege facts plausibly indicating that she suffered any material detriment as a result of being denied overtime, such as opportunities for career advancement. Her conclusory allegation that she was denied overtime, without more, is insufficient to substantiate an adverse employment action.")

Moreover, Plaintiff's allegation that Padilla directed him to "access the department's personnel systems to request paid leave" (SAC ¶ 147), even when construing it in his favor, is also insufficient because Plaintiff fails to allege that such direction was "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Sanders*, 361 F.3d at 755.

As for his allegations that Defendants denied him paid military leave, as Defendants point out, Plaintiff himself seems to concede that such denial was based on his "prior use of New York State military leave in 2020," and not based on Plaintiff engaging in protected activity. (*See* Mot. at 24–25 (citing SAC ¶ 167).) Indeed, in an email from the Town's attorney—which the Court considers because Plaintiff's relevant allegations "rel[y] heavily upon its terms and effect,"[4]— Defendants informed Plaintiff that he had "inadvertently been paid by the Town his full salary for a total of 42 days," which is more than allowed by New York State Military Law § 242.5, for which the Town would "recoup such overpayment of funds made to" him because, otherwise, such "gift" would be in violation of Article 8, Section of the New York State Constitution. (*See* Silverman Decl., Ex. F at 2, ECF No. 49-6); *see also Sprint Spectrum, L.P. v. Mills*, 65 F. Supp. 2d 148, 154 (S.D.N.Y. 1999) ("Article 8, Section 1 of the New York State Constitution prohibits 'the gift, grant or loan of public property to a private party.'").[5]

---

[4]  *See supra note 1.*

[5] The Court acknowledges that Plaintiff also alleges that this "denial" of paid military leave resulted in him "and his family los[ing] their dental coverage." (SAC ¶ 149.) But because, as alleged, Plaintiff's loss of dental coverage arises from Defendants recouping the overpayment of funds to him for the reasons discussed above, then Plaintiff still fails to plausibly allege how it was an adverse employment action. And even insofar as this "loss of benefit" constitutes an adverse employment action, Plaintiff still fails to allege any facts indicating how such action is rooted in retaliatory animus against him for engaging in protected activity. In fact, that Defendants' conduct occurred approximately 8 to 9 months after Plaintiff filed his DOL/VETS complaint and the grievance against Padilla, without more, does not sufficiently allow for an inference of causation. *See Garrett v. Garden City Hotel, Inc.*, 05-CV-0962 JFB AKT, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (collecting cases) ("Although the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, . . . district courts in this Circuit have consistently held

And although Plaintiff plausibly alleges in his retaliation claims that Defendants engaged in adverse employment actions by (1) refusing to enforce previously approved shift swaps he had made with other sergeants resulting in working over $1,000 of overtime for free (SAC ¶¶ 139–41);[6] and (2) denying him promotions to the positions of Detective and Lieutenant in December 2020, (*id.* ¶¶ 150–55, 159–61), Plaintiff nonetheless fails to sufficiently allege "a causal connection between the protected activity and the[se] adverse action[s]." *Kassel*, 272 F. Supp. 3d at 537. Specifically, nowhere does Plaintiff allege any facts indicating—much less, suggesting—that Defendants' adverse employment actions were based on a retaliatory animus resulting from Plaintiff's DOL/VETS complaint or his grievance against Padilla. Moreover, that Defendants made these adverse employment actions approximately 8 to 11 months *after* Plaintiff engaged in these two protected activities, without more, does not sufficiently allow for an inference of causation. *See Garrett v. Garden City Hotel, Inc.*, 05-CV-0962 JFB AKT, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (collecting cases) ("Although the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, . . . district courts in this Circuit have consistently held that a passage of *more than two months* between the protected activity and the adverse employment action does not allow for an inference of causation.") (emphasis added) (internal quotation marks and citations omitted).

---

that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.") (internal quotation marks and citations omitted).

[6] The Court notes, however, that Plaintiff's response in opposition directly contradicts his own allegation in the SAC. Specifically, while in the SAC Plaintiff alleges that Defendants refused to "enforc[e] previously approved swaps [he] had made with other Sergeants" (SAC ¶ 139), in his response in opposition, Plaintiff alleges that Padilla and Callahan "refused to allow [him] *to rescind previously approved shift swaps with other sergeants which were scheduled to occur after the start of his active military leave, without monetary compensation* . . . ," (Resp. in Opp'n at 46 (emphasis added)).

However, the same is not true about Plaintiff's allegations about Defendants denying him the promotion for Lieutenant in March 2021. (*See* SAC ¶¶ 168–75). First, the temporal proximity between Plaintiff commencing the instant lawsuit (January 2021) and the denial of the promotion to Lieutenant (March 2021) is only of approximately three months. And second, unlike in his other allegations relating to the other denials of promotions, Plaintiff does sufficiently allege indirect evidence of disparate treatment for his denial of promotion in March 2021. Specifically, Plaintiff alleges that Defendants passed him over for the promotion in March 2021 for two of Plaintiff's prior subordinates who (1) were not in the military, (2) "have a combined time in service" less than him, and (3) placed lower than him in the Lieutenant Promotion test, in which Plaintiff placed in first place. (*Id.* ¶¶ 82, 150, 174.)

Accordingly, the Court dismisses all of Plaintiff's retaliation claims under 38 U.S.C. 4311(b) except the one regarding Defendants denying him the promotion to Lieutenant in March 2021.

## V.     Leave to Amend

Lastly, leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among other reasons. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended twice, after having the benefit of two pre-motion letters from Defendants stating the grounds on which they would move to dismiss. (*See* ECF Nos. 34 & 41.)

Generally, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257–58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim.") (alteration, footnote, and internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (per curiam) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, nowhere in his opposition does Plaintiff seek further leave to amend or otherwise suggest that he is in possession of facts that would cure the deficiencies that Defendants highlighted in the instant motion and that the Court highlighted in this opinion. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations

leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249–50 (2d Cir. 2004) (per curiam) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make the complaint viable and plaintiffs did not request leave to amend). Accordingly, with respect to all those claims that the Court has dismissed from the SAC, the Court will dismiss them with prejudice.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART, DENIES IN PART Defendant's motion to dismiss (ECF No. 48.) The Court GRANTS the motion with respect to Plaintiff's (1) claim that Defendants' TBPD General Order § 103-9 violates USERRA by imposing additional employment requirements; (2) discrimination claims against Defendants under 38 U.S.C. § 4311(a); and (3) retaliation claims against Defendants under 38 U.S.C. 4311(b) except the one regarding to the denial of promotion to Lieutenant in March 2021. The Court DENIES the motion with respect to (1) Defendants' arguments about Padilla and Callahan not being "employers" under USERRA, and (2) Plaintiff's retaliation claim under 38 U.S.C. 4311(b) regarding to the denial of promotion to Lieutenant in March 2021.

The Court further DIRECTS Defendants to file an answer to the Second Amended Complaint with respect to Plaintiff's retaliation claim under 38 U.S.C. 4311(b) regarding the denial of promotion to Lieutenant in March 2021, on or before October 12, 2022. The Court moreover DIRECTS the parties to confer and jointly complete and file a Case Management Plan and Scheduling Order (blank form attached hereto) by November 2, 2022. After review and approval of the Scheduling Order, the Court will issue an Order of Reference to Magistrate Andrew E. Krause for general pretrial purposes. The parties shall contact Judge Krause within seven (7) business days of the date of the Order of Reference to schedule a conference.

The Clerk of Court is directed to terminate the motion at ECF No. 48.

Dated:  September 12, 2022
       White Plains, NY

SO ORDERED:

_____

NELSON S. ROMÁN
United States District Judge

UNITED STATES DISTRICT COURT                                    Rev. Jan. 2012
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

                                                    **CIVIL CASE DISCOVERY PLAN**
                              Plaintiff(s),          **AND SCHEDULING ORDER**

        - against -


                              Defendant(s).     _____ CV _____ (NSR)


--------------------------------------------------------------x

 This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel,
pursuant to Fed. R. Civ. P. 16 and 26(f):

1.      All parties [consent] [do not consent] to conducting all further proceedings before a
        Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).  The parties
        are free to withhold consent without adverse substantive consequences.  (If all parties
        consent, the remaining paragraphs of this form need not be completed.)

2.      This case [is] [is not] to be tried to a jury.

3.      Joinder of additional parties must be accomplished by _____.

4.      Amended pleadings may be filed until _____.

5.      Interrogatories shall be served no later than _____, and responses thereto
        shall be served within thirty (30) days thereafter.  The provisions of Local Civil Rule 33.3
        [shall] [shall not] apply to this case.

6.      First request for production of documents, if any, shall be served no later than
        _____.

7.      Non-expert depositions shall be completed by _____.

        a.      Unless counsel agree otherwise or the Court so orders, depositions shall not be held
                until all parties have responded to any first requests for production of documents.

        b.      Depositions shall proceed concurrently.

        c.      Whenever possible, unless counsel agree otherwise or the Court so orders, non-party
                depositions shall follow party depositions.

8.      Any further interrogatories, including expert interrogatories, shall be served no later than
_____.

9.      Requests to Admit, if any, shall be served no later than _____.

10.     Expert reports shall be served no later than _____.

11.     Rebuttal expert reports shall be served no later than _____.

12.     Expert depositions shall be completed by _____.

13.     Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.     **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.     Any motions shall be filed in accordance with the Court's Individual Practices.

16.     This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.     The Magistrate Judge assigned to this case is the Hon. _____.

18.     If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19.     The next case management conference is scheduled for _____, at _____.  (The Court will set this date at the initial conference.)

SO ORDERED.

Dated:  White Plains, New York
_____

_____
Nelson S. Román, U.S. District Judge